IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-00728-PSF-CBS

SA'ADAH MAYNARD,

    Plaintiff,

v.

HOSPITAL SHARED SERVICES, INC. d/b/a FIRSTWATCH SECURITY SERVICES,

    Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment (Dkt. # 27), filed on April 14, 2005.  Defendant Hospital Shared Services, Inc. d/b/a Firstwatch Security Services ("Firstwatch") seeks summary judgment on Plaintiff Sa'adah Maynard's claim for relief for discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"), as well as on her state law claims for relief for breach of contract and promissory estoppel.  Firstwatch argues that the facts in this case fail to create triable issues on any of Ms. Maynard's four claims.

Defendant's summary judgement motion is accompanied by exhibits labeled A-1 through A-25, with several exhibits filed under seal.  Plaintiff filed her response to the motion for summary judgement on May 18, 2005, together with exhibits labeled A through D (Dkt. # 37).  Firstwatch filed a reply on June 10, 2005, along with additional exhibits marked A-26 and A-27 (Dkt. # 40).

This case is set for a five-day jury trial to commence on November 28, 2005 at 1:30 p.m.

## I. RELEVANT FACTS

The following facts, except where noted, are undisputed by the parties.  Ms. Maynard is an African-American woman who worked as a security guard for Firstwatch from approximately October 13, 2000 to approximately May 23, 2003.  Def.'s Mot. Summ. J. at 2, 5-6.  Firstwatch contracts with a number of facilities, including Denver International Airport ("DIA"), to provide security services.  *Id.* at 1.  Ms. Maynard was assigned to work at DIA.  *Id.*; Pl.'s Resp. at 1-2.

When she was hired, Ms. Maynard received a copy of Firstwatch's "Employment Guidelines for Employees Providing Security Services to the City and County of Denver."  Def.'s Mot. Summ. J. at 2 (citing Ex. A-3, Employment Guidelines, and Ex. A-4 at 72-73, Maynard Dep.).  She signed an acknowledgment form indicating both receipt of the guidelines and an understanding that the guidelines did not create an express or implied contract.  Def.'s Mot. Summ. J., Ex. A-5 (Receipt Acknowledgment).

Over the course of Ms. Maynard's employment with Firstwatch, the following events occurred:

1.  On December 16, 2000, Ms. Maynard received a written warning when she signed up for an overtime shift but failed to show up or call to explain her absence.  Def.'s Mot. Summ. J., Ex. A-6 (Counseling Form).

2.  On July 16, 2001, Ms. Maynard received an oral reprimand for being out of the area of her post.  Def.'s Mot. Summ. J., Ex. A-7 (Internal Report).

2

3.  On October 3, 2002, Ms. Maynard was assigned to a new post at DIA, working the same shift, but patrolling the perimeter of the airport instead of the parking garages.  Def.'s Mot. Summ. J., Ex. A-4 at 97-99 (Maynard Dep.).

4.  On October 14, 2002, Ms. Maynard received a "final written warning" which stated that she had accumulated too many "attendance points."  (Attendance points are assigned for each attendance infraction, such as being late or missing a shift.)  Ms. Maynard spoke with her supervisor, Crystal Taylor, and pointed out an error in the calculation of her attendance.  The problem was corrected to Ms. Maynard's satisfaction.  Def.'s Mot. Summ. J., Ex. A-9 (Counseling Form); Ex. A-4 at 90-93 (Maynard Dep.).

5.  On October 31, 2002, Ms. Maynard was informed that she needed to change from day shift to swing shift, or else work part-time.  She claims that she was unable to accommodate a schedule change on such short notice, and was forced to part time. Def.'s Mot. Summ. J., Ex. A-4 at 107-08 (Maynard Dep.).  Ms. Taylor claims that Ms. Maynard chose part time because she was unwilling to make changes to her social schedule.[1]  Def.'s Mot. Summ. J., Ex. A-8 at 46-47 (Taylor Dep.).

6.  On February 13, 2003, Ms. Maynard filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC") complaining of race discrimination and retaliation.  Def.'s Mot. Summ. J., Ex. A-10 (Charge of Discrimination).

---

[1]  Ms. Maynard worked a part-time schedule for "a total of four or five days."  Def.'s Mot. Summ. J., Ex. A-4 at 111 (Maynard Dep.).

7.   On April 24, 2003, Ms. Maynard was reprimanded by Officer Tim Waters, a supervisor, for using a cell phone while on duty against policy.  Def.'s Mot. Summ. J., Ex. A-11 (Internal Report).

8.   On May 6, 2003, Ms. Maynard received three "counseling forms" based on the April 24 incident.  (Counseling forms are used by Firstwatch to write up disciplinary issues; the company likewise holds "counseling sessions" to discuss such issues with employees.)  The forms were issued for using a cell phone for personal business while on duty, neglecting duty, and insubordination.  Def.'s Mot. Summ. J., Exs. A-15, A-16, A-17 (Counseling Forms).

9.   On May 7, 2003, Ms. Maynard met with Mr. Waters and Glenn Spies, an assistant manager, to discuss the three counseling forms.  She refused to sign the forms, acknowledging the incident but claiming she was using her phone for work-related purposes.  Def.'s Mot. Summ. J., Ex. A-4 at 150 (Maynard Dep.); Pl.'s Resp. at 7.

10.   On May 12, 2003, Ms. Maynard filed an internal report complaining of discrimination, harassment, and favoritism based on the above incident.  Def.'s Mot. Summ. J., Ex. A-20 (Internal Report).

11.   On May 21, 2003, Steve Davis, DIA's manager for the security contract, asked Ms. Taylor to remove Ms. Maynard from her post.  He was concerned about her attitude, especially because the airport expected a large media presence due to the increased security alert level.  Ms. Taylor removed Ms. Maynard from her post.  Def.'s Mot. Summ. J. at 5-6; Pl.'s Resp. at 4.

4

12. Also on May 21, 2003, Mr. Davis informed Ms. Taylor that Lori Beckman, Director of Security at DIA, also had concerns regarding Ms. Maynard. Ms. Taylor approached Ms. Beckman about this issue, and Ms. Beckman complained of Ms. Maynard's cell phone use on duty as well as a concern with her attitude during an earlier incident. Def.'s Mot. Summ. J. at 6; Pl.'s Resp. at 4.

13. On May 23, 2003, Ms. Taylor informed Ms. Maynard that she was being suspended pending the outcome of an investigation, and asked her to report to the office the next morning. Ms. Taylor asked Ms. Maynard to turn in her badge, but told her she was not being terminated. Def.'s Mot. Summ. J., Ex. A-4 at 176-77 (Maynard Dep.).

14. On May 24, 2003, Ms. Maynard met with Valerie Adams and Lorna Fulton, Firstwatch's Director of Security and Director of Human Resources. They confirmed Ms. Maynard's suspension pending the outcome of an investigation. Def.'s Mot. Summ. J., Ex. A-4 at 180-81 (Maynard Dep.).

15. On May 30, 2003, Mr. Davis requested that Firstwatch permanently remove Ms. Maynard from her position at DIA. He made the request by e-mail. Def.'s Mot. Summ. J., Ex. A-22 (E-mail).

16. On June 6, 2003, Ms. Maynard picked up a check at the Firstwatch office and informed Julie Martinez, the office manager, that any further meetings would need to be coordinated with her attorney. Def.'s Mot. Summ. J., Ex. A-4 at 195 (Maynard Dep.); Pl.'s Resp. at 5. Firstwatch claims that Ms. Martinez asked Ms. Maynard to return on June 9 to talk to Ms. Anderson and Ms. Fulton. Def.'s Mot. Summ. J. at 7.

Ms. Maynard does not recall this request.  Def.'s Mot. Summ. J., Ex. A-4 at 188, 195 (Maynard Dep.).

17.  Firstwatch claims to have attempted to contact Ms. Maynard's attorney, Lee Judd, leaving messages on June 9, 10 and 13.  Def.'s Mot. Summ. J. at 7 and Ex. 23 thereto (Fulton Letter dated June 13, 2003 to Judd).  Mr. Judd claims that he did not receive any such messages.  Pl.'s Resp., Ex. B (Judd Aff.).

18.  On June 5, 2003, Ms. Maynard's attorney sent a letter to Firstwatch requesting all wages due following her termination.  Def.'s Mot. Summ. J., Ex. A-24 (Judd Letter dated June 5, 2003 to Firstwatch).

19.  On June 5, 2003, Ms. Maynard filed a second charge of discrimination with the EEOC claiming race discrimination and retaliation for the earlier EEOC charge. Def.'s Mot. Summ. J., Ex. A-25 (Charge of Discrimination).

20.  On June 13, 2003, Ms. Fulton sent a letter to Ms. Maynard's attorney claiming that Ms. Maynard had not been terminated.  Def.'s Mot. Summ. J., Ex. A-23 (Fulton Letter).  According to the letter, Firstwatch processed her departure as a resignation because she had failed to respond to attempts to meet with them to discuss reassignment.  Ms. Maynard received a copy of this letter.  Def.'s Mot. Summ. J., Ex. A-4 at 186-87 (Maynard Dep.).

21.  After receiving the letter, neither Ms. Maynard nor her attorney contacted Firstwatch to discuss reassignment.  *Id.* at 189-90.

## II.  CLAIMS AND DEFENSES

Ms. Maynard's complaint asserts four claims for relief.  First, she claims that her reassignment, shift changes, and suspension were the result of racial discrimination in violation of Title VII.  Second, she claims that some of these actions were taken in retaliation for filing complaints of racial discrimination, an activity protected by Title VII.  Third, she claims that Firstwatch terminated her employment in contravention of its policies, constituting a breach of contract.  Finally, she makes a claim under the doctrine of promissory estoppel, because Firstwatch failed to abide by promises on which she reasonably relied, resulting in damage.

Firstwatch requests summary judgement on each claim.  It asserts that Ms. Maynard cannot establish that she suffered any adverse employment action for the purpose of Title VII, nor can she show any causal connection between any action by Firstwatch and her race or her participation in any protected activities.  Finally, Firstwatch asserts that there was no contract or enforceable promise between itself and Ms. Maynard.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party.  *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).  To defeat a properly

7

supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In addition, "where the non-moving party will bear the burden of proof at a trial on a dispositive issue that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

## IV.  CLAIM ONE: TITLE VII RACE DISCRIMINATION

Ms. Maynard's claim of racial discrimination can be separated into two types of allegations:  disparate treatment and wrongful termination.  Firstwatch contends that Ms. Maynard cannot establish a *prima facie* case for discrimination under either allegation, cannot show that the legitimate, non-discriminatory reasons for all employment actions articulated by Firstwatch are pretextual, and cannot show any evidence that Firstwatch made any employment decisions because of her race.

Title VII prohibits employers from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment" because of the individual's race.  42 U.S.C. § 2000 e-2.  The Court analyzes each of Ms. Maynard's Title VII discrimination claims separately under the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jaramillo v. Colo. Judicial Dep't*, 2005 WL 2865187 *1 (10th Cir., Nov. 2, 2005).

8

Under this framework, Ms. Maynard has the initial burden of establishing a *prima facie* case for racial discrimination.  Once she has made the initial showing, Firstwatch must articulate a legitimate, nondiscriminatory reason for the employment action.  If Firstwatch satisfies this burden, it is entitled to summary judgment unless Ms. Maynard can show there is a "genuine issue of material fact as to whether the proffered reasons are pretextual."  *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

### A.  Disparate Treatment

Ms. Maynard alleges that during the course of her employment with Firstwatch, she has been subject to several acts of racial discrimination.  First, she claims that she was discriminated against when she was required to move to a new post when white employees were not also moved.  Pl.'s Resp. at 10.  Second, she claims that she was discriminated against when Firstwatch offered her the choice between an immediate shift change and moving to part-time.  *Id.*  Finally, she claims that her supervisor, Crystal Taylor, discriminated against her by pressuring another supervisor to issue several "counseling forms" that the supervisor would not otherwise have written.  *Id.* at 7.

The *prima facie* case is not intended to be an inflexible requirement; rather, the purpose is to eliminate the most common nondiscriminatory reasons for discharge, including lack of qualification and elimination of the position.  *Plotke*, 405 F.3d at 1099.  "The critical *prima facie* inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination."  *Id.* at 1100 (quoting cases).

Different articulations of the *prima facie* case may be used in different circumstances, depending on the context of the claim and the nature of the alleged adverse employment action. *Id.* at 1099.  In the case of disparate treatment, the Tenth Circuit has required the following elements:  (1) membership in a protected class; (2) adverse employment action; and (3) disparate treatment among similarly situated employees.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005); *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

Ms. Maynard's membership in a protected class is not in dispute.  She has alleged three adverse employment actions: change in post, change in shift, and the counseling form incident.  Firstwatch claims that these actions do not constitute adverse employment actions.

An adverse employment action is one that results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  The Tenth Circuit has held that mere inconvenience or alteration in job responsibilities does not constitute adverse employment action.  *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998).  The employer's conduct must be "materially adverse" to the employee's job status.  *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).  This includes acts that put the employee at "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."

*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)).

With regard to the change in post at DIA, Ms. Maynard has not been subject to an adverse employment action under controlling Tenth Circuit case law.  In *Sanchez*, a teacher was transferred to a different school, where her commute was more inconvenient (thirty to forty minutes, instead of five to seven).  *Sanchez*, 164 F.3d at 532.  However, the court held that "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment," it is not an adverse employment decision, and the employee's positive or negative view of the transfer does not bear on that point.  *Id.* at n. 5.  Likewise in this case, Ms. Maynard's move from patrolling the parking garages to patrolling the perimeter of the airport did not involve any significant change in her employment and is not an adverse action merely because she did not want the transfer.

The move to part-time may constitute an adverse employment action.  Ms. Maynard was forced to choose between changing shifts or going part-time–a choice between a potentially significant disruption to her personal schedule or a smaller paycheck.  Further, according to the employee manual submitted by Firstwatch, a "change in employment classification [from full-time to part-time] may affect an employee's eligibility for benefits."  Def.'s Mot. Summ. J., Ex. A-3 at FW 0529 (Employment Guidelines).   Examination of the manual reveals that catastrophic sick leave, personal hours leave, flexible spending accounts, health insurance, and life insurance are only available to full-time employees.  *Id.* at FW 0549, 0556, 0559, 0562,

and 0563.  If Ms. Maynard was forced to part-time status, it is clear that there would be a significant change in benefits even though her hourly wage did not change.

The counseling form incident also qualifies as an adverse employment action. Officer Tim Waters, a supervisor, reprimanded Ms. Maynard for using a cell phone while on duty.  Two weeks later, she received three counseling forms based on the incident, and was called in for a counseling session.  In *Wells*, the court held that mere "unsubstantiated oral reprimands" are not in themselves materially adverse, *Wells*, 325 F.3d at 1214, implying that written reprimands may be treated differently.  In this case, the oral reprimands were followed by written counseling forms that would presumably become a part of Ms. Maynard's personnel file.  The receipt of three counseling forms for disciplinary infractions could be "materially adverse" to both her reputation as an employee and her future employment prospects.  For example, an employer may be less willing to grant a promotion to an employee who appears to have a history of disciplinary problems.  Indeed, in its Motion for Summary Judgement, Firstwatch refers to the counseling forms as evidence of Ms. Maynard's unsatisfactory job performance. Def.'s Mot. Summ. J.  at 11.

The third element of the *prima facie* case is that the adverse employment action represents disparate treatment compared to other employees similarly situated.  Ms. Maynard has not produced any evidence that the adverse actions at issue were taken because she is African-American, or that other similarly situated employees were

treated differently.[2]  There is no evidence that Ms. Taylor or any other supervisor made any mention of Ms. Maynard's race specifically, or any racially derogatory remarks generally, or considered race a factor in any action they took.

With regard to the counseling form incident, Ms. Maynard claims that Mr. Waters only wrote her up because Ms. Taylor pressured him to do so.  However, this allegation is contrary to Mr. Waters' own statement that he was not influenced by anyone when he made the decision to write her up.  Def.'s Mot. Summ. J., Ex. A-18 (Signed Note).  Ms. Maynard has not alleged that Mr. Waters was discriminating against her; rather, she has claimed that Ms. Taylor discriminated against her by pressuring Mr. Waters to write her up.  Def.'s Mot. Summ. J., Ex. A-4 at 150 (Maynard Dep.).  Even if this scenario as depicted by plaintiff is true, it does not demonstrate any inference of race-based animus.  *See, e.g.*, *Salguero v. City of Clovis*, 366 F.3d 1168, 1178 (10th Cir. 2004) (Title VII "prohibits only intentional discrimination *based upon* an employee's protected class characteristics.") (emphasis in original).  Absent any evidence that Ms. Taylor actually influenced Mr. Waters' decision, or that race discrimination was an underlying factor in the chain of events, this appears to be a case of a supervisor acting in accordance with his ordinary duties in a non-discriminatory fashion.  Ms. Maynard has not shown disparate treatment.  While the write-ups may well seem unusual or extreme for the alleged infraction of on-the-job cell phone use, the courts may not "act as a super personnel department that second guesses employers' business judgments."

---

[2]  Ms. Maynard does allege that similarly situated white employees were not trans-ferred to a new post.  Pl.'s Resp. at 10.  However, this change was not an adverse employment action, and thus her *prima facie* case failed at the second step.

*Jaramillo*, 2005 WL 2865187 at *3, *Simms v. Oklahoma ex rel Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999).

As for the move to part-time status, Ms. Maynard has also not introduced any evidence of disparate treatment.  In her Response, she asserts that when she was "forced to part-time status it constituted race discrimination."  Pl.'s Resp. at 9.  She refers to her deposition testimony in support of this assertion: "Q: Okay.  What was it when you went on part-time status?  Is that discrimination?  Is that retaliation?  Is that harassment?  Is that all three?"  "A: Discrimination."  Pl.'s Resp., Ex. A at 85 (Maynard Dep.).  Ms. Maynard's bare assertion is insufficient to establish disparate treatment. *See, e.g.*, *Annett*, 371 F.3d at 1237 (unsupported conclusory allegations "do not create a genuine issue of fact" to defeat a summary judgment motion) (quoting *L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000)).  She alleges that her assistant manager, Mr. Spies, "indicated that he believed that the transfer was race discrimination and that he had had other complaints of race discrimination regarding Ms. Taylor."  Pl.'s Resp. at 10.  However, the only evidence she offers to support this allegation is her own conclusory deposition testimony.  Ms. Maynard thus has failed to establish a *prima facie* case for disparate treatment based on her race.

Accordingly, there is no need to address Firstwatch's nondiscriminatory justification for its actions, or Ms. Maynard's attempts to demonstrate that those reasons are pretextual.

### B.  Termination

In the case of a claim for wrongful termination, the articulation of the *prima facie* case is slightly different.  The plaintiff must show that she was (1) a member of a protected class; (2) qualified and satisfactorily performing her job; and (3) terminated under circumstances giving rise to an inference of discrimination.  *Salguero*, 366 F.3d at 1175; *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1416-17 (10th Cir. 1993).

The first element is satisfied because it is undisputed that Ms. Maynard is African-American and a member of a protected class.  To meet the second element, Ms. Maynard must show that there is a genuine issue of material fact as to whether she was performing her job satisfactorily at the time of the alleged termination.

Firstwatch cites evidence showing that Ms. Maynard's performance was not satisfactory.  Ms. Maynard was written up several times for performance issues over the course of her employment.  Def.'s Mot. Summ. J. at 11 and exhibits cited therein.  Also, Firstwatch received complaints about Ms. Maynard's performance from personnel at DIA, and claims these complaints led it to remove her from her position at the airport.  Def.'s Reply at 5-6.  In fact, Firstwatch claims that it was contractually obligated to remove Ms. Maynard from her post at the airport at DIA's request.  Def.'s Reply at 5-6; Def.'s Mot. Summ. J., Ex. A-3 (Employment Guidelines).

Ms. Maynard counters that because Firstwatch takes the position that it did not terminate her, her work must be satisfactory; otherwise, they would have terminated her.  Pl.'s Resp. at 12.  Even viewing the evidence in the light most favorable to Ms. Maynard, she cannot argue both that she was terminated for discriminatory reasons, and that because she was not terminated, she was performing satisfactorily.  Thus, she

15

has not presented sufficient evidence to meet the second requirement of the *prima facie* case.

Even assuming the second requirement is met, Ms. Maynard does not meet her *prima facie* burden.  For the third element, she must show that she was terminated under circumstances giving rise to an inference of discrimination.  This case presents a dispute over two issues within this element: whether there was a termination, and whether the circumstances indicate discrimination.

Firstwatch claims that Ms. Maynard was not terminated; rather, she was temporarily suspended, and failed to report to receive a new assignment as requested.  Def.'s Mot. Summ. J. at 12.  At that point, they assumed she had resigned.  *Id.*  Ms. Maynard, on the other hand, claims she was suspended and asked to turn in her badge, which purportedly only happens when someone is terminated.  Pl.'s Resp., Ex. C at 2 (Charge of Discrimination).  She contends she was never contacted again until her attorney sent a letter to Firstwatch.  Pl.'s Resp. at 5.  Firstwatch claims to have left three messages for her attorney, but both Ms. Maynard and her attorney deny receiving any messages.  Pl.'s Resp., Ex. B (Judd Aff.).  Ms. Maynard has established that there is a disputed issue of fact as to whether she was terminated.

However, Ms. Maynard must also present evidence that the termination occurred under circumstances that give rise to an inference of discrimination.  Although she contends that the termination occurred as the final act in a string of discriminatory actions taken against her, Ms. Maynard has not established a *prima facie* showing of disparate discriminatory treatment.  Absent evidence of a pattern of racial

discrimination, and given the undisputed facts regarding problems with her performance, Ms. Maynard has shown no evidence that even if she was terminated, it was because she is African-American.  Rather, the evidence shows that if she was terminated, it was due to unsatisfactory performance.  Ms. Maynard's bare allegation that her termination must have been the result of discrimination is insufficient to allow an inference that the alleged termination was discriminatory.  *See Annett*, 371 F.3d at 1237 (unsupported conclusory allegations "do not create a genuine issue of fact" to defeat a summary judgment motion).

Because Ms. Maynard has not established a *prima facie* case for discrimination, there is no need to analyze Firstwatch's nondiscriminatory reasons or Ms. Maynard's showing of pretext.

The evidence Ms. Maynard has produced in support of her claim is not sufficient to establish that material facts exist that would allow a reasonable jury to find in her favor.  Accordingly, the Court GRANTS summary judgment in favor of Firstwatch on Ms. Maynard's claim of Title VII race discrimination.

## V.  CLAIM TWO: RETALIATION

Ms. Maynard claims that after she filed an EEOC charge alleging racial discrimination by Firstwatch, she was subject to retaliation.  A Title VII retaliation claim based on circumstantial evidence is analyzed under the same *McDonnell Douglas* burden-shifting framework as a discrimination claim.  *Annett*, 371 F.3d at 1237.  The plaintiff's *prima facie* case has three elements: (1) the plaintiff engaged or participated in a prior protected Title VII activity; (2) the plaintiff was later disadvantaged by her

employer's action, either subsequent to or contemporaneously with such protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id.*; *Chavez v. City of Arvada*, 88 F.3d 861, 865-66 (10th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997).

It is undisputed that Ms. Maynard's filing of an EEOC charge on February 13, 2003 is an activity protected by Title VII.  Ms. Maynard also filed an internal complaint report on May 12, 2003, eleven days before the alleged termination.  Def.'s Mot. Summ. J., Ex. A-20 (Internal Report).  Although this second report does not make a direct allegation of race discrimination, it may properly be considered protected activity under Title VII.  The crucial inquiry is whether the employer knows that the employee was opposing an action made unlawful by Title VII.  *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002).  Given that Ms. Maynard had already filed an EEOC charge specifically alleging racial discrimination, it seems reasonable to assume that Firstwatch knew that when Ms. Maynard referred to "discrimination" in her report, she meant "racial discrimination."  There is a triable issue as to whether the report is a protected activity under Title VII.

Her original charge was filed on February 13, 2003; therefore, only actions that occurred after this date can be considered retaliatory.  This includes the counseling form incident in April and May 2003 discussed *supra*, and the alleged termination in May 2003.  Ms. Maynard also refers to being transferred to "numerous posts" in the period after November 17, 2002, and claims that this was retaliation.  Pl.'s Resp., Ex. A

at 82:9-83:2 (Maynard Dep.).  However, there is no indication or evidence that these transfers occurred after the protected activity.

The definition of an adverse employment action is the same in the retaliation context as in the discrimination context.  As discussed *supra*, the counseling form incident could be considered an adverse employment action because of the possible harm to Ms. Maynard's reputation and future employment prospects.  The alleged termination is also an adverse employment action.  *See Burlington Indus.*, 524  U.S. at 761 (listing "firing" as an example of adverse employment action).

Finally, Ms. Maynard must demonstrate a causal connection between the EEOC charge and the adverse action.  Temporal proximity of the protected activity and the adverse action is sufficient to establish this element.  *Annett*, 371 F.3d at 1240.  However, the adverse action must be "*very closely* connected in time to the protected activity" in order for "mere temporal proximity" to establish a causal connection inference.  *See Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005) (emphasis in original) and cases cited therein.  As recognized by the Tenth Circuit in *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004), a "six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."  *See also Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding a three-month period without more too long to establish a causal connection). The counseling form incident took place on May 6, one week short of three months from the date of Ms. Maynard's EEOC charge on February 13.  In the absence of other evidence, the timing

here is too remote to establish the causation element.  *See Meiners*, 359 F.3d at 1231

(finding an "elapsed time . . . of about two months and one week . . . probably too far

apart . . . to establish causation by temporal proximity alone).

The alleged termination took place on May 23, more than three months after the

February EEOC charge.  However, Ms. Maynard's internal report was submitted on

May 12, eleven days before the alleged termination.  This is close enough in time to

satisfy this requirement.  *See id.* (a six week period is sufficient).  Ms. Maynard has

established the *prima facie* case with regard to the alleged termination.  Thus, the

Court now considers Firstwatch's legitimate, non-retaliatory reason for the termination

and Ms. Maynard's showing of pretext.

At the summary judgment stage, the defendant needs only articulate a

legitimate, nondiscriminatory reason for the employment action.  *Martin*, 3 F.3d at 1417.

The defendant does not need to "litigate the merits of the reasoning" or show that the

proferred reason was bona fide or applied in a nondiscriminatory fashion.  *EEOC v.

Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992).  Firstwatch's first argument,

discussed *supra*, is that Ms. Maynard was not actually terminated.  Alternatively,

Firstwatch claims that if Ms. Maynard was terminated, it was for the legitimate reason

that she did not cooperate with its effort to reassign her.  Def.'s Mot. Summ. J. at 15

and Ex. A-23 cited therein (Fulton Letter).  Further, Firstwatch claims that she was

suspended from her position for the legitimate reason that DIA management requested

her removal.  *Id.*  These reasons are sufficient to shift the burden back to Ms. Maynard

to demonstrate some indicia of pretext.

20

Unfortunately for Ms. Maynard, while temporal proximity may be sufficient to establish causation for the purpose of the *prima facie* case, alone it is not enough to establish pretext. *Annett,* 371 F.3d at 1240 (finding that "close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment"). In her response to Firstwatch's motion for summary judgment, Ms. Maynard does not even attempt to make an argument that its reasons were pretextual. Pl.'s Resp. at 15. The gist of her argument is that Firstwatch knew about the EEOC complaint, and Ms. Maynard was later forced to part-time status and fired. *Id.* However, "[m]ere conjecture that the [employer] acted with discriminatory reasons will not suffice to establish pretext." *Annett,* 371 F.3d at 1241.

The evidence Ms. Maynard has produced is not sufficient to establish that material facts exist that would allow a reasonable jury to find pretext. Accordingly, the Court GRANTS summary judgment in favor of Firstwatch on Ms. Maynard's claim of Title VII retaliation.

## VI.  CLAIM THREE:  BREACH OF CONTRACT

Ms. Maynard claims that Firstwatch breached an implied contract by terminating her employment in contravention of its "policies, practices and/or procedures." (Complaint and Jury Demand, ¶ 28.)  As an initial matter, Firstwatch maintains its claim that Ms. Maynard was not terminated.  However, even if she was terminated, Firstwatch claims she was an at-will employee, and that no contract existed between Firstwatch and Ms. Maynard regarding termination or any other aspect of employment.  Def.'s Mot. Summ. J. at 19.  Specifically, Firstwatch points to the absence of a written termination

policy, a conspicuous disclaimer of intent to contract on the employee manual beyond an at-will basis, and Ms. Maynard's acknowledgment of the disclaimer.  Def.'s Reply at 22-23.

Ms. Maynard has not introduced any evidence that Firstwatch has set forth a written termination policy.  Firstwatch introduced a copy of its "Employment Guidelines for Employees Providing Security Services to the City and Count of Denver" dated January, 1999, Def.'s Mot. Summ. J., Ex. A-3 (Employment Guidelines), which contains no termination policies or procedures that outline the steps to be taken prior to termination.[3]  Ms. Maynard has not alleged the existence of any other written policy.

Ms. Maynard instead appears to rely on an unwritten policy that "only severe conduct would result in termination."  Pl.'s Resp. at 20.  Her evidence on this point is the testimony of Ms. Goebel, the Director of Human Resources.  However, as noted above, Ms. Goebel was hired after the end of Ms. Maynard's employment.  In her deposition, Ms. Goebel testified that to her knowledge, the 1999 Employment Guidelines were the only policies relevant to Firstwatch employees at DIA, that she did not know the content of the orientation Ms. Maynard received when she began her employment, and that she could not speak to the disciplinary process that would have

---

[3]  The only section that might fit this description is a paragraph that reads: "FWSS reserves the right to impose a disciplinary action that FWSS, in its opinion, deems appropriate depending on the circumstances involved.  Disciplinary actions range from a verbal reprimand to discharge.  The action taken by FWSS in an individual case does not establish any precedent in other circumstances.  Employees should not assume FWSS' action in an individual case establishes a precedent for further disciplinary situations."  Def.'s Mot. Summ. J., Ex. A-3 at FW 527 (Employment Guidelines).  This does not appear to set forth a progressive discipline or other policy beyond at-will employment.

been followed before she was hired.  Pl.'s Resp., Ex. D at 13-15 (Goebel Dep.).  While noting that "severity of the incident" would be considered in a termination decision, Ms. Goebel did not state that a company policy abrogating its broad discretion on any termination decision.  *Id.* at 20.

Ms. Maynard also offers her own testimony that "supervisors and management" led her to believe that she could not be fired without going through certain disciplinary steps.  Pl.'s Resp., Ex. A at 209-10 (Maynard Dep.).  However, other than asserting in vague and general terms that Mr. Spies led her to believe this, she has not articulated what she believed that policy to be, or what words or conversations led her to believe it.

In order to have a viable claim that the alleged unwritten policy created a contract, Ms. Maynard would have to show that Firstwatch's actions in promulgating the alleged termination policy constituted an offer, meaning that "the employer manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent to he bargain was invited by the employer and that the employee's assent would conclude the bargain."  *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987).  There is no evidence that the alleged unwritten policy was a manifestation of Firstwatch's intent to bargain with Ms. Maynard, or that such a contract governing termination existed.  Accordingly, the Court GRANTS summary judgement in favor of Firstwatch on Ms. Maynard's claim for breach of contract.

## VII.  CLAIM FOUR: PROMISSORY ESTOPPEL

Ms. Maynard's final claim is that even if there was no contract, she is still entitled to recovery under the theory of promissory estoppel.  She alleges that Firstwatch

expected employees to rely on its policies, and that she did in fact rely on the policy to her detriment.

For a successful promissory estoppel claim, Ms. Maynard must show three elements: (1) "the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the termination procedures;" (2) "the employee reasonably relied on the termination procedures to his detriment;" and (3) "injustice can only be avoided by enforcement of the termination procedure." *Continental*, 731 P.2d at 712. (While *Continental* specifically involved an employee manual, the same elements apply to other types of promises. *See Chidester v. E. Gas & Fuel Assocs.*, 859 P.2d 222, 224-25 (Colo. App. 1992).)

As discussed *supra*, there is no evidence of a termination policy set forth in the employee manual. However, Ms. Maynard claims the "policies, practices and/or procedures" of Firstwatch constitute a promise. She further claims that "the policies, practices and/or procedures are very definite and very clear, not vague assurances." (Response at 21.) However, in the absence of a written policy, any evidence that such a policy was ever articulated, or evidence of a practice or procedure that would imply a policy upon which estoppel can be based, it is impossible to determine the content of the "very definite and very clear" policies Ms. Maynard allegedly relied on. There is no evidence of a promise made by Firstwatch with regard to a termination policy. Further, Ms. Maynard has not put forth any evidence showing reliance on such a policy.

Accordingly, the Court GRANTS summary judgment in favor of Firstwatch on Ms. Maynard's promissory estoppel claim.

**VIII. CONCLUSION**

For the reasons stated above, the Court GRANTS Defendant's motion for Summary Judgment (Dkt. # 27).  The Clerk of the Court is directed to enter judgment for the defendant, which is hereby awarded its costs pursuant to F.R.Civ.P. 54(d)(1).

DATED: November 4, 2005

BY THE COURT:

s/ Phillip S. Figa

_____
Phillip S. Figa
United States District Judge